# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LORENZO B. WINFORD,

        Plaintiff,

      -vs-                                  Case No. 06-C-1000

MATTHEW J. FRANK and
JEFFREY P. ENDICOTT,

        Defendants.

# DECISION AND ORDER

Plaintiff, Lorenzo B. Winford, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and is proceeding *in forma pauperis* on claims under the First and Fourteenth Amendments. This matter comes before the court on the plaintiff's motion to amend the complaint and the defendants' motion for summary judgment. Both applications will be addressed herein.

## I. PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

The plaintiff has moved to amend his complaint to include a conspiracy claim under 42 U.S.C. § 1985. The Local Rules provide in relevant part:

> A motion to amend a pleading must specifically state in the motion what changes are sought by the proposed amendments. Any party submitting a motion to amend must attach to the motion the original of the proposed amended pleading. Any amendment to a pleading, whether filed as a

> matter of course or upon motion to amend, must reproduce the entire pleading as amended, and may not incorporate any prior pleading by reference.

Civil L.R. 15.1 (E.D. Wis.).

In the present case, the plaintiff has not submitted a copy of the proposed amended complaint. Moreover, amendment of the complaint to include a § 1985 conspiracy claim would be futile. *See Moore v. Indiana*, 999 F.2d 1125, 1128 (7th Cir. 1993)(a plaintiff will not be allowed to amend his complaint if such amendments will be futile). That is, all of the defendants are employed by the Wisconsin Department of Corrections (DOC) and a conspiracy cannot exist solely between members of the same entity. *See Payton v. Rush-Presbyterian*, 184 F.3d 623, 632 (7th Cir. 1999)(under the intracorporate conspiracy doctrine, a conspiracy cannot exist between members of the same entity); *see also Beese v. Todd*, 35 Fed. Appx. 241, *243 (7th Cir. Mar. 21, 2002)(holding that a conspiracy cannot exist solely between members of the DOC). For these reasons, the plaintiff's motion to amend the complaint will be denied.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Factual Background

On September 22, 2006, the plaintiff filed a § 1983 action against defendants Matthew Frank and Jeffrey Endicott. By decision and order dated November 1, 2006, the court screened the complaint and permitted the plaintiff to proceed on claims that the defendants violated his rights under the First Amendment when they denied him several

religious books. Additionally, the plaintiff was permitted to proceed on a claim that the defendants discriminated against him on the basis of his religion in violation of the Fourteenth Amendment's Equal Protection Clause. On May 9, 2007, the defendants filed a motion for summary judgment, which is fully briefed and ready for resolution.

**B. Standard of Review**

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id*. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id*.

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id*. at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party

3

seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id*. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id*. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record - only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

## C. Relevant Undisputed Facts[1]

The plaintiff was incarcerated at Redgranite Correctional Institution (RGCI) at all times relevant. (Affidavit of Jeffrey P. Endicott [Endicott Aff.] ¶ 7). Defendant Matthew Frank is the Secretary of the Wisconsin Department of Corrections (DOC).

---

[1] The facts in this section are derived from the plaintiff's verified complaint and proposed findings of fact, to the extent they are undisputed, and the defendants' proposed findings of fact and affidavits, to the extent they are undisputed. *See* Civil Local Rule 56.2 (E.D. Wis.).

4

(Affidavit of Matthew J. Frank [Frank Aff.] ¶ 2). Defendant Jeffrey Endicott is the warden of RGCI. (Endicott Aff. ¶ 2).

The plaintiff practices Satanism. (Complaint [Compl.] at 10). On November 29, 2004, while at Green Bay Correctional Institution (GBCI), the plaintiff requested copies of the following Satanic texts: (1) *Book of the Dead*; (2) *Necromantic Ritual Book*; (3) *Necronomicon*; (4) *Necronomicon Spell Book*; (5) *the Satanic Bible*; and (6) *Satanic Rituals*. (Compl. Ex. K). The plaintiff was transferred to RGCI before he could take possession of these publications. (*See* Compl. Ex. A).

Upon his arrival at RGCI on April 26, 2006, the plaintiff requested the following publications: (1) *Necronomicon*; (2) *The Church of Satan*; (3) *The Satanic Bible*; (4) *The Satanic Rituals*; (5) *Voodoo Charms and Talismans*; (6) *Voodoo and Hoodoo*; (7) *The Black Pullet*; (8) *Complete Book of Voodoo*; (9) *Book of Legendary Spells;* (10) *Voodoo Handbook of Cult Secrets*; (11) *Book of the Dead*; (12) *The Book of Black Magic*; (13) *MAGICK*; (14) *The Necromantic Ritual Book*; (15) *Famous Voodoo Rituals and Spells*; (16) *Original Black and White Magic*; and (17) two copies of the *Black Flame International Forum of the Church of Satan*. (Affidavit of Sally J. Wess [Wess Aff.] ¶¶ 6-7; Ex. 1013-1014).

On April 28, 2006, the property that the plaintiff brought to RGCI from GBCI was returned to him. (Compl. at 5). However, the plaintiff was not allowed to have the requested books about Satanism. *Id*. The plaintiff subsequently filed an inmate complaint

5

asking that he be provided with the publications. *Id*. at 7. The plaintiff was informed that his books would need to be approved by Chaplain Campbell before he could take possession of them. *Id*.

### The Satanic Bible

*The Satanic Bible*, by Anton Szandor LaVey, preaches self-indulgence, self-gratification and vengeance. (Affidavit of Bruce Muraski [Muraski Aff.] ¶ 10). These tenets are demonstrated by several "Satanic Statements" set forth in the book. *Id*. For example, one statement provides: "Satan represents vengeance instead of turning the other cheek!" *Id*. Another provision states: "Satan represents all of the so-called sins, as they all lead to physical, mental, or emotional gratification." *Id*. *The Satanic Bible* also advocates that the weak are here to serve the strong, that believers should rebel against the laws of man and hate authority, and that bodily impulses are to be pursued regardless of the consequences. *Id.*

### The Necronomicon Spellbook

*The Necronomicon Spellbook* provides specific instructions and requirements for casting spells. (Muraksi Aff. ¶ 11). A large portion of the book is devoted to spells designed to cause harm to others, including spells to curse or kill others. *Id*. For example, Spell # 20 states that "The 20th name is Suhrim. Seeks out the worshipers of the ancient ones wherever they may be. The priest who sends him on an errand does so at terrible risk, for Suhrim kills easily and without thought. His word is masshangergal." *Id.*

6

### The Voodoo Handbook of Cult Secrets

*The Voodoo Handbook of Cult Secrets* encourages people to cast evil spells to jinx, hex or cause harm to others. (Muraski Aff. ¶ 13). For example, there is a "Black Art" spell which provides a "spell for a person to bind himself to the devil. Purpose is to jinx, hex or cross others." *Id.*

### Application of rules governing religious property

Inmates are permitted to possess approved religious property associated with their designated religious preference, unless the item presents a threat to the order and safety of the institution. (Endicott Aff. ¶ 13). The DOC has developed and implemented DOC 309 IMP #6, a uniform written procedure relating to the religious beliefs and practices of inmates in a DOC correctional institution. (Affidavit of Leo Campbell [Campbell Aff.] ¶ 16; Ex. 1010). According to IMP #6, religious literature is subject to inspection to ensure conformity with property regulations that are consistent with security policies and procedures. (Campbell Aff. Ex. 1010 at 13). Religious groups that advocate hate groups or security threats are not allowed. (Campbell Aff. Ex. 1012 at 3).

Chaplain Campbell reviewed the books the plaintiff requested to determine if they were appropriate for distribution. (Campbell Aff. ¶ 11). The chaplain has the responsibility to make recommendations regarding inmate religious property not on the approved property list. (Campbell Aff. Ex. 1010 at 14; Ex. 1011 at 7; Ex. 1012 at 4). When an inmate transfers to RGCI from another DOC institution, the chaplain does not

7

automatically review all of the inmate's religious property. (Campbell Aff. ¶ 9). This is because some property, such as the Bible and the Koran, have already been approved as acceptable at RGCI. *Id.*

Chaplain Campbell did not specifically deny the plaintiff his books. (Campbell Aff. ¶ 12). Instead, he forwarded them to security and to the Inmate Complaint Examiner (ICE) to aide in the investigation of the plaintiff's complaint. (Campbell Aff. ¶ 12). Ultimately, Chaplain Campbell, the ICE and the property supervisor determined that the publications were not appropriate for distribution. (Wess Aff. ¶ 6). Additionally, Chaplain Campbell and others met with the plaintiff to tell him that he could not advocate practicing Satanism at RGCI during Pagan worship. (Campbell Aff. ¶ 13).

**D. Analysis**

The defendants assert that they are entitled to summary judgment because Matthew Frank was not personally involved in the alleged wrongdoing. Additionally, the defendants contend that there is no genuine issue of material fact as to the plaintiff's First and Fourteenth Amendment claims.

**1. Personal Involvement**

The plaintiff has sued defendant Frank because he allowed his subordinates to: (1) prevent the plaintiff from practicing Satanism; and (2) discriminate against the plaintiff on the basis of his religion. However, defendant Frank argues that he was not personally involved in the alleged constitutional violations. Section 1983 does not create a claim based

8

on collective or vicarious responsibility. *See Pacelli v. deVito*, 972 F.2d 871, 875 (7th Cir. 1992). To establish liability under 42 U.S.C. § 1983, a plaintiff must prove that each defendant was in some way personally responsible for the alleged deprivations, and that the deprivations occurred with the knowledge and consent of that defendant. *See Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994); *Smith v. Rowe*, 761 F.2d 360, 368-69 (7th Cir. 1985). An official is personally involved if: a) he or she participates directly in the constitutional deprivation; b) acts or fails to act with reckless disregard of plaintiff's constitutional rights; or c) the conduct that deprived plaintiff of his constitutional rights occurred at the official's direction or with his or her knowledge and consent. *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986); *Smith*, 761 F.2d at 369.

In the present case, the plaintiff has submitted a letter that he wrote to defendant Frank complaining that RGCI officials had taken his religious items. (Pl.'s Resp. Ex. A). The court notes that the letter is not authenticated. *See Scott v. Edinburg*, 346 F.3d 752, 760 n. 7 (7th Cir. 2003)(in evaluating a motion for summary judgment, the court may consider as evidence properly authenticated and admissible documents or exhibits). However, it is undisputed that the letter was sent to defendant Frank, who forwarded it to defendant Endicott for action. Defendant Endicott, in turn, explained why the plaintiff's inmate complaint regarding his religious books was denied.

An official will satisfy the personal involvement requirement of § 1983 if he deliberately disregards the plaintiff's constitutional rights. *See Fillmore v. Page*, 358 F.3d

9

496, 506 (7th Cir. 2004). That is, "[a] prison official's knowledge of prison conditions learned from an inmate's communication can . . . require the officer to exercise his authority and to take the needed action to investigate, and if necessary, to rectify the offending condition.'" *Reed v. McBride,* 178 F.3d 849, 854 (7th Cir. 1999) (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). However, mere awareness of an alleged violation does not make the official personally responsible. *Crowder v. Lash*, 687 F.2d 996, 1005-06 (7th Cir. 1982). Where a supervisor's only involvement was to write a letter to the plaintiff explaining or justifying the subordinate's actions, this involvement is insufficient to support a § 1983 claim. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182-83 (7th Cir. 1994). Because this is all the plaintiff has alleged, defendant Frank will be dismissed from this action for lack of personal involvement.

### 2. First Amendment

The plaintiff asserts that his First Amendment free exercise rights were violated when he was deprived of his Satanic texts. As a prisoner, the plaintiff retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Encompassed within the First Amendment is the right of free exercise of religion.

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005).[2]

Inmates are entitled to practice their religion so long as doing so does not unduly burden the institution. *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992). A prison regulation that infringes upon an inmate's free exercise rights may be valid "if it is reasonably related to legitimate penological interests." *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994)(quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991)(prison officials need only make reasonable efforts to afford inmates an opportunity to practice their faith). In addition to determining whether a state interest is rationally related to a challenged regulation, the following factors should be considered: whether the regulation leaves open alternative means of exercising the right; the impact accommodation would have on other inmates, guards, and prison resources; and whether there are obvious, easy alternatives to the restriction. *Turner*, 482 U.S. at 89-90; *see also Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004).

In the context of the free exercise clause, the plaintiff must first establish that his right to practice Satanism was burdened in a significant way. *See Kaufman*, 419 F.3d at 683; *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989)(plaintiff must show a "substantial burden" on a "central religious belief or practice" to prevail under the Free

---

[2] For purposes of this order, the court assumes that Satanism is a religion. *See Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 714 (1981)("the resolution of [what constitutes a religion] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").

11

Exercise Clause)); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003)(collecting cases). As the Supreme Court stated in *Hernandez*, 419 F.3d at 681,

> The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling government interest justifies the burden. It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.

In the present case, it is undisputed that the plaintiff is a Satanist and that he was denied several religious books upon his arrival at RGCI. However, the plaintiff has presented no evidence showing that he was unable to practice Satanism without the benefit of these publications. Indeed, the plaintiff states: "[t]he denial of plaintiffs (sic) books does not stop his beliefs[.]" (Pl.'s Prop. Find. of Fact ¶ 27). Moreover, the plaintiff concedes that Satanism is an offshoot of Paganism and, therefore, he attends the Pagan worship group. (*See* Compl. at 10; Campbell Aff. ¶ 13). For these reasons, the plaintiff has not shown that the denial of the requested books substantially burdened his ability to practice Satanism. However, additional reasons warrant dismissal of the plaintiff's First Amendment claim.

In the present case, the defendant has demonstrated that there is a legitimate state interest in preventing the plaintiff from possessing certain Satanic texts. *The Necronomicon Spellbook* and the *Voodoo Hanbook of Cult Secrets* both set forth spells that can be used to harm others. The *Satanic Bible* teaches its adherents to disobey authority.

12

And, while the defendants do not specifically address each of the other requested publications, it is undisputed that they are designed and used to cause harm to other people.

The defendant reasonably asserts that the plaintiff was not allowed to possess these materials because they jeopardize the safety and security of the institution, staff and other inmates. It is well established that maintaining institutional security is a legitimate state interest. *Al-Alamin*, 926 F.2d at 686. Moreover, a correctional institution has an obligation to ensure the safety and medical well-being of its inmates. *See Russell v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004).

Notably, the plaintiff has argued that the interests asserted by RGCI are invalid because he was permitted to possess his Satanic texts at GBCI. In support of his assertion, the plaintiff has submitted a Property Receipt and Disposition Form from GBCI dated November 30, 2004. (Pl.s' Resp. Ex. C). However, this document merely shows that the plaintiff *requested* permission to possess the following items: (1) *Book of the Dead*; (2) *Necromantic Ritual Book*; (3) *Necronomicon*; (4) *Necronomicon Spell Book*; (5) *the Satanic Bible*; and (6) *Satanic Rituals*, and that these items were "being checked by Capt. Brant." *Id*. The proffered evidence does not demonstrate that the plaintiff was allowed to have any of these publications. Thus, the plaintiff has not demonstrated that the asserted state interests are invalid.

Once it has been determined that a regulation bears a rational relationship to a legitimate state interest, the court should examine whether there is an alternative way for

13

the plaintiff to exercise the asserted right. *See Turner*, 482 U.S. at 89-90; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)(the inquiry here is whether, under the restrictions imposed, the plaintiff is deprived of all means of practicing his religion). As discussed above, the plaintiff has acknowledged that there are several ways to practice Satanism without the books he requested.

The next factor to be considered is assessing the reasonableness of a regulation is the impact accommodation of the plaintiff's right to practice Satanism will have on others. *See Turner*, 482 U.S. at 89-90. Because Satanism encourages harm to others and disrespect for legal order and authority, the plaintiff's right to worship Satan can be exercised only at significant costs to guards and other prisoners. Where such a trade-off is necessary, prison administrators must be given wide-ranging deference in the operation of penal institutions. *See Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

Finally, the lack of workable alternatives is evidence of the reasonableness of the restrictions imposed. *See Turner*, 482 U.S. at 89-90. Here, the plaintiff has not offered any alternatives that would fully accommodate his asserted right at *de minimus* costs to the interests that gave rise to the restrictions. For all these reasons, the restrictions on the plaintiff's ability to practice Satanism are reasonably related to valid penological interests and, therefore, do not violate his free exercise rights. Therefore, summary judgment will be granted as to this claim.

14

**3. Equal Protection**

The plaintiff alleges that he was treated differently from other inmates arriving at RGCI because of his religious views. Governmental entities are generally required to treat all similarly situated persons in a similar manner. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause prohibits government officials from making distinctions among groups of speakers based on the content of their speech. *See, e.g., Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). To prevail on an equal protection claim, a plaintiff must prove the following: (1) the defendant intentionally treated him differently from others similarly situated; (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest. *Smith v. City of Chicago*, 457 F.3d 643, 650-51 (7th Cir. 2006). *Turner v. Safely*, 482 U.S. 78 (1987).

In the present case, the parties do not dispute that the plaintiff was treated differently from other inmates because he requested Satanic materials. Specifically, prison officials reviewed the plaintiff's religious materials to determine whether they were appropriate for distribution, while the religious items such as Bibles and Korans were not because they were already on an approved list. Therefore, the relevant inquiry is whether this difference in treatment was rationally related to a legitimate state interest. *See Turner*, 482 U.S. at 89.

15

The rational-basis test is a lenient standard; the government's action simply "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and *some* legitimate governmental purpose. *Smith*, 457 F.3d at 652 (emphasis in original). In other words, the plaintiff must demonstrate "governmental action wholly impossible to relate to legitimate governmental objectives." *Patel v. City of Chicago*, 383 F.3d 569, 572 (7th Cir. 2004). To meet this standard, the plaintiff must show "malicious conduct" on the part of government officials, or "conduct that evidences a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Id*. at 573 (internal quotation marks omitted).

The court finds that the same reasoning employed in the earlier discussion of the plaintiff's First Amendment claim shows that there is a legitimate state interest in treating Satanic publications differently than other religious material. That is, the requested Satanic books can be used to harm others and they advocate disrespect for authority. As such, the defendant is reasonably concerned that these publications have the potential to threaten the health and safety of the institution as well as other inmates and staff. *See Al-Alamin*, 926 F.2d at 686; Russell, 384 F. 3d at 448. Moreover, the plaintiff retains other ways in which to practice his religion, permitting Satanic religious material to enter the institution unscreened poses a potential risk to other inmates, and the plaintiff has presented no alternatives that would accommodate his right at little or no cost to the asserted state interests. *See Turner*, 482 U.S. at 89-90.

16

Notably, the plaintiff argues that other potentially violent books like the Bible and the Koran were not screened to determine if they were appropriate for distribution. At the outset, the evidence on file does not show that the Bible and the Koran were *never* screened like the plaintiff's books. Rather, they have already been reviewed and have been found to comply with institution rules regarding allowable property. And, although the Bible and the Koran may contain references to violence, no evidence has been submitted to show that these texts were created for and intended to cause harm to others like the requested Satanic publications. To the extent the plaintiff is complaining that the Bible and the Koran should be sent to the Chaplain for review every time an inmate enters RGCI, there is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977). Furthermore, "prison officials, when making these types of decisions, need not demonstrate actual danger in order to support the reasonableness of their determinations. It is enough to show that a potential danger exists without the restrictions of a challenged prison regulation. *Brown v. Johnson*, 743 F.2d 408, 413 (6th Cir. 1984).

Because it has been established that there are legitimate state interests for reviewing Satanic literature, the burden shifts to the plaintiff to demonstrate that the defndant's action is "wholly impossible to relate to legitimate governmental objectives."

17

*Patel,* 383 F.3d at 572. Here, the plaintiff has failed to make such a showing. Therefore, summary judgment will be granted as to this claim.

**IT IS THEREFORE ORDERED** that the plaintiff's motion to amend the complaint (Docket # 45) is **denied.**

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket # 32) is **granted.**

**IT IS FURTHER ORDERED** that this action is **dismissed.**

**IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2008.

                **SO ORDERED,**

                s/ Rudolph T. Randa

                **HON. RUDOLPH T. RANDA**
                **Chief Judge**